We welcome you to the Ninth Circuit today, after a great Fourth of July weekend, glad to have you here. My name is Judge Smith. I'm the baby on the Ninth Circuit, the newest one appointed, and somehow got picked to be the presiding judge today, so you all are in bad trouble today that I have to be the presiding. Nonetheless, I've got with me some good help, and I'm very privileged and honored to sit with Honorable Fernandez here to the right of me. He was appointed to as a circuit judge by President George H.W. Bush, and took senior status on June 2, 2002, and has been just a model on our court, and it's always great to sit with him. And then he and I are very honored today to have Judge Mills with us. He was nominated to the District Court for the Central District of Illinois on April 2, 1998, by President Reagan, and is a major general in the Illinois militias, so be careful of him. But we're glad to have him with us. I should give you a little advice. You have a clock out there in front of you, which will give you the amount of minutes that you have. The green light will come on when you begin, and the yellow light will come on with two minutes left in your argument. If you want to save some rebuttal time, you need to advise the clerk, and she will give you some warning about that. We don't care whether you have rebuttal time or not. We don't watch it for you. We just ask the questions that we think we ought to ask to get to the bottom line in these particular matters. When the red light comes on, your time is done. Even though the time will continue to click and it'll look like you still have time, if the red light is on, you're in deficit spending, and so I will be cutting you off at that time. We will hear the cases as they're presented on the calendar, and we have several cases which have already been submitted on the briefs. We will begin, of course, with 0576871, which is Eduardo Medina Espinoza versus Eric Holder, which was submitted on the briefs, and therefore it is submitted. Case 0577131, Roberto Morales Garcia versus Holder is also submitted on the briefs. Case 0856036, William Terry Bradford versus G. J. Gerbino is submitted on the briefs. And case 0756538 and 0855402, Interstate Fire and Casualty versus Pacific Employers Insurance Company is submitted on the briefs, and now we move to the last two cases on the calendar. We will now call case 0756790, which is Skidmore Energy, Inc. versus Madea Holdings, S.A. and all the rest of the defendants, and when you come to the pulpit council, if you'd please give us your name so that we will know you and we'll begin. Remember the time. Come ahead. May it please the Court, my name is Greg Standerfer. I am here on behalf of the appellant Skidmore Energy, Inc. Thank you very much. Could I start out with a question? Yes, Your Honor. And that is, how can we say that a single meeting in California gives personal jurisdiction when all of the harms occurred either in Texas or Morocco? Well, in this case, Your Honor, there was a meeting that was called the defendants chose the forum. They asked for a meeting in California on behalf of the defendants and came to California to meet with the appellant's representative. By that time, the drilling operations had been shut down because under a previous agreement, they had not paid the bills. And the defendants were seeking to reobtain the drilling operations and so were the plaintiff, the appellant. But there was a meeting that they chose the forum, they came to California. In that meeting, they made misrepresentations and omissions upon which we relied. The issue from the court perspective is that they came here, they misrepresented, that if Mr. Gustin, the appellant's representative, if he would resign his controlling position, there were two co-managing directors, and with the co-managing directors, they had the power to block each other. If he would resign his position, the defendants would maintain, would pay all the bills and would recommence drilling. That agreement was, in fact, reduced to writing and signed by the parties. Now, the defendants had denied that there was an agreement, but that if he would resign, they would recommence drilling and pay the bills. He did resign. That allowed them total control over the operations of the operating entity. And as a result of that total control, they authorized the issuance of 3 million new shares. There were 10,000 outstanding. And then in October of 2001, issued 1.5 million new shares to MFM, one of the appellees, which had the effect of watering down our ownership of the operating entity from 44 percent to .27 percent. Let me ask you a question just to, I'm going to back up just a little bit. He, you can tell he's a general. He jumped right in and gave you a question. But let me ask you, it seems to me that we're really looking for a test for a specific jurisdiction in this case. You're agreeing with that? Yes, sir. I am. All right. And in looking for that, it seems to me that we are really looking to see if one purposely avails for a contract or purposeful direction for Torch. That is correct. You agree with that? That is correct. And I guess I'm trying to figure out how I can suggest that this meeting was any more than a mere incidental meeting to the party's overall contracting relationship. And I mean, my worry is that the, to me, why isn't the memorandum of understanding really the causal link? There were a number of memorandums of understanding. Well, I understand. But there was one memorandum of understanding that came after the conversations. Why wasn't that the causal link? Because that's the really the thing that was put together to suggest what happened. Even your complaints suggest that the California activities were preliminary. No. Well, our complaint alleges that at that meeting with respect to the contract, that there was an agreement that was negotiated and entered into within the state of California between the defendants' representatives and the appellant's representative as to the, what was going to happen. That Mr. Gustin would resign, they would take over complete control, they would pay the bills and they would recommence drilling. That is the very contract that is made the subject of the breach of contract claim in this case. It is the contract that was both negotiated and entered into in the meeting in California. Well, weren't the, excuse me, go ahead. You're claiming there was a tort committed, correct? There was also a tort committed, yes, Your Honor. You're claiming there was a tort committed, correct? That's correct. Tell me about the letter from one of the parties that said, no, we're not going to take it. We never agreed to that. That's your idea. I understand that. But the understanding, understand this is a pre-answer motion to dismiss. The allegations contained in the four corners of the complaint must be accepted as true and no controverting declarations can be filed in order to controvert the allegations contained in the complaint. I want to finish my question instead of telling my proceedings, Your Honor. Just tell me, what about the letter? Well. Assuming the letter is in there, how does that affect the attorney court? It does not, because the mere fact that after making the misrepresentations, that they then go back and once they have obtained the relief they want, which is Mr. Gustin's resignation, that they then come back. Well, what I think the letter addressed, if it's the letter the court is referring to. Well, Your Honor, all I can say is that once the representations were made, I think that the letter that went back and forth was from DeGioia and the appellants representative and one of the defendant's representatives, where he indicated, I thought it was a good idea, let's move forward. Now, if they came back and said, we did not agree to pay all of the bills, but they didn't deny that they agreed to pay many. Well, but that doesn't, yes, Your Honor, that doesn't mean that they didn't offer to pay a substantial number of the bills. They've never denied that they did represent, that they would get the drilling recommenced. That was the activity that we sought to get done. They were the money partner and they needed to get drilling recommenced. The failure to get the drilling recommenced didn't occur for quite some time. The injuring event was the watering down of the shares, where we're watered down from almost one-half owner to 0.27 percent. Well, and I understand that, Your Honor. And the representation, we didn't agree to pay all of them, is not a representation, we didn't agree to pay a lot of them. And we didn't agree to get the drilling recommenced. The primary objective that we had was to get the drilling recommenced on this oil and gas reserve. Let me ask you another question. You argue for common law, personal jurisdiction. Do I have any case law supporting such a theory? Yes, Your Honor. It's Hartford Fire versus California. Well, but it doesn't seem to me that that really goes to this particular case. I've read that case and it doesn't seem to... Why is that case helpful to you? What I read Hartford to say is that if there is purposeful availment, predicate acts that are committed within the United States, and damage flows within the United States, then common law jurisdiction exists within the United States. And the issue is not whether jurisdiction exists, it is whether it is reasonable to assert that jurisdiction. And once the jurisdiction exists under Hartford, the burden shifts to the defendants to prove that the exercise of that jurisdiction is unreasonable in this particular case. Now, again, in a pre-answer motion, I don't think that's permissible. They can't come back and offer evidence outside the four corners of the complaint. Because under Hartford Fire, and here's the dilemma we have, the defendants in Texas argue, wait a minute, there is no predicate act committed in Texas for this particular tort and this particular contract. You've got to go someplace else. The only place where the predicate acts are committed is in California. And we come to California and they say, wait a minute, yes, there may have... Well, they don't say yes, they deny it. But assume for me that predicate acts were committed in California, their response is, wait a minute, the damages didn't flow in the Ninth Circuit or in California, they flowed in Texas. But the Texas court really didn't say that the acts commenced in California. No, they didn't. No, the court did not. It simply dismissed the case for want of jurisdiction. And it said they didn't have jurisdiction, and you didn't appeal, correct? I was not counsel at that time, but no, that decision was not appealed by prior counsel. So in effect, just because Texas didn't say, that says that they didn't have jurisdiction and nobody appeals it, that really doesn't have any bearing on what we do here. I think that's true. But what the defendants argue is that California should be a safe haven for fraud. If a foreign defendant can convince a plaintiff from a different state to meet me in California where I undisputedly commit the fraud, then as long as the damages flowed to a different district, there is no place within the United States. Let me ask you a question. For the tort you suggest, where did the reliance occur? In my humble opinion, the reliance is, well, I will say the reliance occurred in California because Mr. DeGioia made the decision. Where did the damage occur? Well, the damage probably flowed outside the district. I do not disagree with the defendants that the situs of the appellant corporation was Texas and that the damages flowed to the appellant corporation. I cannot dispute that. But what I can say is that absent jurisdiction here, the defendants suggest that there is no place within the United States within which jurisdiction will lie and that we must go to a state like Morocco that is on the State Department's travel restricted list for danger to Americans and try a case that involves friends and family members of the king. I don't think that that is substantial justice and provides us with a forum within which to assert the claims at least that the complaints say predicate acts occurred within this district. The misrepresentations, no omissions occurred here. The contract was negotiated and formed here. And if that's true, on the contract claim jurisdiction should lie here and this is much like an assault, a Moroccan citizen assaults a Texas resident on the streets of California. Even though, and let's assume he's killed instantly, his estate is the only plaintiff. The defendants suggest that despite the fact that the acts occurred here, that since the only damage flowed to the estate in, let's assume Texas, that no jurisdiction lies here for that tort committed here. And based upon the Hartford fire case and based upon a number of U.S. Supreme Court cases that hold that common law jurisdiction lies within the United States and it is only the exercise of that which must be determined, the trial court did not determine whether the exercise of that jurisdiction was reasonable. The trial court improperly held that there was no jurisdiction and we believe there was. I have three minutes left I'd like to reserve for rebuttal. Thank you. Thank you, Your Honor. You don't want to talk about the statute of limitations here? I would love to, but if I do, I'm not going to have any time at all for rebuttal. I will address that in rebuttal. May it please the Court, my name is George Lederer. I represent all of the appellees other than Mr. Saoud. In other words, the Moroccan defendants as they're referred to in the brief. I will address the personal jurisdiction issues and Mr. Kim will address the statute of limitation issues and we're going to split our time up 10-5 if the Court willing. You can split it the way you want. You've got to keep track of it. Thank you, Your Honor. Now, we would like to say the issue in this case is simple, as I believe has already been identified by the Court, is whether the specific jurisdiction test has been met. It hadn't been met for at least three separate reasons in our opinion. One, there was no evidence of any conduct expressly aimed at California. There was no harm caused in California from the acts which occurred in California. And lastly, it wouldn't be reasonable to exercise jurisdiction in California. Now, well, if an in-state tort did occur here at that California meeting, wouldn't that be enough to give California personal jurisdiction? No, Your Honor, it would not be because there was, Mr. DeJory is not a party to this case. So there was, if, I guess that's assuming a lot, if there was a tort there, I mean, there, of course, wasn't a tort there. We just have a representation that they said they would pay for the creditors of Lone Star, now known as MPE. But I guess possibly if there was a tort there, if it was more like two non-residents were tort when they had the damage occurred there, and there was a, and possibly, yes, we don't have that in our case. We don't have a tort, and we don't have a party. We don't have jurisdiction, in our opinion. And I would. Suppose I'm the, I'm the unit bonder, okay, and I send a letter from California to Massachusetts. I actually come from Idaho, but I come to California, and I send a letter to Massachusetts, and they explode there and hurt somebody, okay? Can that person sue in California? Can you hear me? Can I sue in California? Can the injured plaintiff come to California and sue Mr. Unabomber here, on the basis that he handed his death letter from there? I don't think so, but I, I think so. It doesn't sound like our case. The damage has to occur here, but. No, well, no, not as the, but you've got to. The damage did not occur here. Yeah, that's a good point. No, we don't have, it's going back to the test that, that no one disputes. So we don't have the conduct aimed here, and we don't have damage occurring here. We don't have anybody here. We just have an incidental meeting here. And I would like to follow up on. On, on this motion that we have in front of us. How can one on these facts suggest that there is no aim at California when your clients ask for the meeting to be here? Well, what we have is we do have an act in California, but the complaint of conduct, the alleged tort was not aimed at California. That's the distinction I'm making. All of the representations that were alleged, which were incidentally that the creditors would be paid, all of that related to performance outside of the United States. All of those creditors are foreign entities. They're all, all the actions to be conducted following the meeting, all related to things in Morocco. So you don't have any aiming of what was the representations that are complained about. None of that is aimed at California. And as the court is aware, you have more than just, even if, even if you had a party, you know, like for instance, if Skidmore was a California corporation, which it's not, you probably still wouldn't have jurisdiction because you've got to  have, as the court, this court has made clear in the Pebble Beach versus Caddy case, there's got to be more than just a foreseeability. You've got to have an express aiming here. And you also have to have the damage caused here. So you don't, you don't have damage caused here. In fact, there's no record of any damage caused anywhere. In fact, I mean, by Skidmore, it's just been some theoretical damage that they've, I don't know that there's any evidence in the record that Skidmore was damaged. So, and as I would like to add, if I may, that I believe the court focused on correctly the memorandum of understanding, which I think is a, is a critical link in what, what they're really, and shows the fallacy of their arguments. The memorandum of understanding they're complaining about that they said based on their company's ratification of it, they said that he resigned on, that was dated April the 11th, 2001. The meeting occurred April the 26th, 2001. The alleged ratification occurred May the 22nd, 2001. So you have in where they say, and I believe it's in paragraph 42 of the complaint and paragraph 40 read together, they say based on the fact that the company ratified that April 11th memorandum of understanding, not the meeting, but that, that Gustin resigned on, you know, May the 22nd. So you have, the meeting doesn't have anything to do with the resignation, even under their own facts. And you also have, I would like to point out to the court, even under their own briefs, they say on one hand that the predicate acts occurred in California, that the, the tortious conduct, we know they alleged it was like an automobile accident here, but yet at the same time, they actually say in their briefs that no cause of action arose from anything having to do with the meeting. They say that no party has alleged that any cause of action, and I quote their reply brief on page nine, that any cause of action, quote, was or could have been based upon an allegation that some of the lawn storage creditors went unpaid or that drilling was temporarily shut down. That's at pages nine and 10. They, and I could, I could put you several statements to the same effect, but I think another key one is that there were, they say, quote, there were no discussions at the April, 2001 meeting about, and that's not quoting here, about the issuance of millions of additional shares on July the 31st, 2001 that caused the legal injury by deleting a felon's ownership in Loan Store. And then they say on a couple of other different spots, the only tort injury they have is when they were diluted, and they say that on about three or four separate occasions, all of which has nothing to do with the meeting in California. So as we stated, we, we believe it's clear that they haven't met the test. They haven't come close to meeting three elements of the test. And for that, we would like, and if the court has no further questions of me, I'll be happy to give Mr. Kim our time. Any questions? No. Okay. Thank you. Good morning. May it please the Court, Tilden Kim, appearing on behalf of Appellee Abdu Saoud. Mr. Saoud is also personally present here. I bring that out because Mr. Saoud has been involved in, in these series of lawsuits for many years now, and it all stems from this one isolated incident, this meeting in 1998. Mr. Kim, aren't we on thin ice deciding the statute of limitations issues solely from the face of the complaint? And as counsel points out, that's before answer. I'm sorry. You're on it before? I think he said before answer. Yes. Yes. And, and we're fully, we fully believe that the district court properly ruled on the four corners of the complaint. The district court gave the plaintiff every benefit of the doubt in applying the more generous four-year rule under Texas, as opposed to the three-year statute of limitations in California. We think the California rule applies. However, even under the Texas four-year rule, the discovery rule in Texas is, is very broad. You know, the, the test under that Wingate case, basically whenever a plaintiff has knowledge of facts that would lead to the injury, and they don't have to know the full extent of the injury or the cause, but once they are on notice of, you know, the facts, then the time starts ticking. And as the district court correctly noted, by May of 2001, you had a, you had a situation where, you know, the drilling operations had ceased, you know, the bills weren't getting paid. We're talking, we're not talking incidental problems here. We're talking the very function of that ongoing business concern having been ceased. I can't think of any more set of facts that would put a plaintiff on notice that there's a problem. And that's when the time started ticking, in May of 2001. And given that we have to make some factual determination here, is this not a jury question? I don't think so, Your Honor, because we have a situation where not only does the court look on the four corners of the complaint, but in giving the plaintiff the potential opportunity to amend, to, you know, make the pleadings even past the pleading requirements for the statute of limitations, the court can look at past pleadings, and this is the first remaining complaint. Can we really decide facts? As alleged in the complaint, Your Honor, yes. So you're suggesting then that the reason we get to this is that all of these are undisputed facts? As alleged in the complaint, Your Honor. And I think the court should also remind itself that the district court gave the plaintiffs every benefit of the doubt in imputing all these acts that happened, you know, prior to May 2001 to Mr. Saud. When all the complaints that were previously filed, even the operative complaint here, the first amended complaint, has Mr. Saud specifically referenced in the meeting in August of 2000, I'm sorry, in the meeting in 1998 with the President. But, counsel, isn't that what you'd like to have happen? Wouldn't you like all the facts given to the plaintiff in their most egregious way, give them every benefit of every fact, and then determine it, and don't we need undisputed facts, and therefore we can make the determination if the district court hadn't given them every benefit of the doubt, then there might be some facts in there that you would argue. If you're going to move for summary judgment or for a motion to dismiss, you've got to have the facts in there, don't you? Absolutely. And that's what the district court did, Your Honor. Not only did the district court give them the benefit of the statute of limitations, the four-year versus the three-year, the district court also gave them the benefit of all these facts happening that did not involve Mr. Saud, you know. As pleaded. But even if they did involve them?   Egyptian gave the state the benefit of the doubt, and concluded that by May of 2001 that under the Texas discovery rule the times start of ticking, and that's why their time more. If the court has no further questions, I would rust. Questions? Thank you. Thank you. May I please the court? The trial court did not accept the allegations of the First Amendment complaint as true, and did not accept and did not give the every reasonable doubt in favor of the plaintiff appellant. The trial, and we know it didn't because the trial court quoted the controverting declarations of the defendants in her orders of dismissal. But a counsel, just because a trial court quotes the controverting assertions doesn't mean anything. What the trial court's trying to do, put all the facts the way they are, if you don't dispute any of the facts, the fact that they have them in the affidavit, they've got to put them in the district court's order. If you dispute any of those facts, then they don't put them in. But it seems to me that in this particular situation with the statute of limitations, nobody is disputing that Armadillo had failed to provide operating capital by May 2001. Medellin Holding had failed to provide legal compliance by that day. Drilling Operations had shut down by that day. Skidmore now owned only 22% of the company by that day. The defendants now own more of the company. Several defendants actively interfered with Gustin's efforts to get additional financing by refusing to disclose the ownership of Armadillo by that day. And some of the defendants had previously concealed payments to the King of Morocco by that day. All of those facts undisputed in this record. And your honor, those may be egregious breaches of contract. But even an egregious breach of contract will not either support a finding of fraud or be evidence of a fraud, the fraud not being committed until October of 2001 within limitations when they issued the additional 1.5 million shares to water down Skidmore. And that's the operative issue in this case. Early breaches of contract that the parties continued to negotiate when the oil and gas was discovered following that and the drilling operations had been shut down, we allege that there was a plan, a scheme that they came up with to get Mike Gustin to resign so that they would have total control and could then water down the shares. We would have to have been clairvoyant to have been able to determine in May of 2001 that in October of 2001, the fraud and breach of fiduciary duty would have been committed by the issuance of the shares and watering down of our ownership. We simply can't get there from the early breaches of contract. Now, honestly, I don't think the discovery rule has a lot to do with the claims that we've alleged. We do allege the discovery rule, but. Well, that was going to be my question. Why are we in Texas at all if you think all this happened in California? Why are we in Texas at all? For a statute of limitations. We have alleged that, and the court did not decide which state's law applied. The court said, I'm going to assume that the longer Texas law applied. What did you allege? What did your complaint say? The complaint says that Texas law applies. Why does Texas law apply in this situation if you're on California law on the other situation? Well, because there's a difference. I have a tough time seeing the differences here. And there's a huge difference between enough predicate acts being committed for jurisdiction and the most significant relationships in the transaction applying. But, Judge, we don't need it. The breach of fiduciary duty claim is four years in California. The breach of contract claim is four years in California. And those, the issuance of the shares and the watering down of our ownership of the corporation which caused us the injury occurred within four years of the filing of suit. Thank you. Thank you, Your Honor. Case 0756790, Skidmore v. Meadie Holdings is submitted. Thank you, counsel, for your argument.
judges: Fernandez, Smith N. R., Mills